IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 27, 2015


**STATE OF TENNESSEE v. JENNIFER LEE DICKEY**

**Appeal from the Circuit Court for Lawrence County**
**Nos. 30535, 30536, 32086, 32087     Jim T. Hamilton, Judge**

_____

**No. M2014-02512-CCA-R3-CD – Filed December 10, 2015**
_____


The defendant, Jennifer Lee Dickey, appeals the trial court's decision ordering her to serve her sentence in incarceration. She argues that the trial court erred in denying her an alternative sentence. Following our review, we affirm the judgment of the trial court.


**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which and ROBERT W. WEDEMEYER and D. KELLY THOMAS, JR., JJ., joined.

Ronald G. Freemon (on appeal) and John Russell Parkes (at sentencing), Columbia, Tennessee, for the Appellant, Jennifer Lee Dickey.

Herbert H. Slatery III, Attorney General and Reporter; Tracy L. Alcock, Assistant Attorney General; Brent Cooper, District Attorney General; and Christi Leigh Thompson, Assistant District Attorney General, for the Appellee, State of Tennessee.


**OPINION**

## FACTS AND PROCEDURAL HISTORY

On February 24, 2012, the defendant was charged with two counts of aggravated burglary, Class C felonies, against Jason Scott and Courtney Woods. She pled guilty to these counts and received concurrent three-year sentences. She received post-plea diversion, which was contingent upon her completion of a one-year rehabilitation treatment program in Alabama called Teen Challenge. On January 24, 2014, a grand jury indicted the defendant for several new charges, including two counts of aggravated burglary against Denise Henson and Herbert Cheatwood.[1] Pursuant to a plea agreement, the defendant pled guilty to a total of four aggravated burglaries. Her charges from 2012 were reinstated, and she pled guilty to the two new counts of aggravated burglary. The sentences for her 2012 burglaries were ordered to be served concurrently, and she received six-year sentences for the 2014 burglaries that were to be served concurrently to each other but consecutively to her three-year sentence. She received an effective sentence of nine years, with the method of service to be determined by the trial court.

At the sentencing hearing, Beth Ladner testified that she prepared the presentence report for the defendant. The presentence report included a victim impact statement from Ms. Henson and a statement from the defendant in which she accepted responsibility. Ms. Ladner testified that the defendant completed a year-long treatment program in Teen Challenge in December 2012. Ms. Ladner stated that she met with the defendant personally, and she could not tell if the defendant was remorseful because she was in jail or remorseful for the choices that she made.

Brent Hunter, an investigator for the Lawrence County Police Department, testified that he investigated the burglaries that the defendant committed in 2012. The defendant was detained at Mr. Scott's residence, and she gave Investigator Hunter permission to search her vehicle. He found prescription pill bottles with names of persons other than the defendant on the label, and one of the bottles had Ms. Woods's name on it. He also found a 2007 directory for the defendant's church with "MapQuest" directions and phone numbers for various addresses. The discovery of these items led Investigator Hunter to believe that the defendant had committed other burglaries and led him to investigate the burglary of Ms. Woods's residence. The defendant confessed to Investigator Hunter that she had entered the residence of three to four individuals listed in the church directory and taken medications from them. The defendant told Investigator Hunter that she would select her victims based on conversations that she had with them, and she said that she had a conversation with Ms. Woods where the subject of neck pain

---

[1] In the transcript, Mr. Cheatwood's name is alternatively spelled "Cheatwood" and "Cheakwood." The indictment spells his name as "Cheatwood," and we utilize that spelling in this opinion.

was raised. Investigator Hunter explained that several of the victims elected not to prosecute the defendant because they knew her personally. The defendant admitted to Investigator Hunter that she was addicted to prescription painkillers.

The prosecution also introduced testimony of a past crime for which the defendant had never been prosecuted. Lois Gilbert testified that in September 2007, she learned that her husband was suffering from lung cancer. Ms. Gilbert worked at a daycare center, and the defendant's son was one of the children Ms. Gilbert supervised. Medical bills were mounting for the family, and members of the community contributed money to assist the Gilberts, who were traveling back and forth from Columbia for doctor's appointments. Just before Thanksgiving in 2007, the defendant informed Ms. Gilbert that "she had something" for Ms. Gilbert. Ms. Gilbert asked the defendant to give her the item, but the defendant insisted on following Ms. Gilbert home. The defendant had her young son with her at the time. When Ms. Gilbert arrived at her house, the defendant followed her inside. Ms. Gilbert set down her purse and keys and hurriedly went to help her husband get dressed for the doctor's appointment. Ms. Gilbert heard her "keys rattling" and the defendant saying that her young son "likes keys." Ms. Gilbert knew that the defendant's son enjoyed playing with keys, but she also believed that the defendant's son was not making the noise with the keys. The defendant then gave Ms. Gilbert a slip of paper that was a gift certificate for barbecue from a local restaurant, and she told Ms. Gilbert that Ms. Gilbert needed to go to the restaurant to pick up the food.

The defendant was the last person in the house with Ms. Gilbert, and Ms. Gilbert testified that she locked the door before she left her home. When Ms. Gilbert returned from the doctor's appointment, she went to retrieve her house key. She discovered that her key was missing, along with her sister's house key. Using an extra key, Ms. Gilbert unlocked her door and went into the house, where she saw her house key and the food gift certificate. Ms. Gilbert stated that her husband had a full bottle of pain medication that was missing, and medication from Ms. Gilbert's prescription and her daughter's prescription was also missing.

Ms. Gilbert recalled conversations she would have with the defendant where she would answer affirmatively when the defendant would ask, "I bet [Mr. Gilbert] in a lot of pain, isn't he?" Ms. Gilbert testified that she reported the theft to law enforcement, but she chose not prosecute the case because she wanted to keep the theft hidden from her husband due to his poor health. Ms. Gilbert testified, "Anybody that would take from a dying man, I have no respect for. And he was a dying man."

Jason Frakes testified that he worked at the City of Lawrenceburg Fire Department with the defendant's ex-husband, Jason Dickey. Part of Mr. Frakes's responsibility was to inspect the city fire hydrants. While conducting one such

3

inspection, he saw the defendant's vehicle at Mr. Cheatwood's residence, which was puzzling to Mr. Frakes. He contacted his father, who in turn contacted Mr. Cheatwood. Mr. Cheatwood returned to his home, but no one was there. He checked his medications and noticed that some were missing. He then left to pick up his mother and later returned to his residence. The defendant was in his driveway, and he confronted her. Mr. Frakes learned all of this information from his father, who had spoken with Mr. Cheatwood. Mr. Cheatwood also spoke to neighbors, who informed him that they had seen the defendant's vehicle at the home on several occasions. Mr. Cheatwood initially did not plan to prosecute the defendant, but he changed his mind after persuasion from his neighbors. Mr. Frakes testified that Mr. Cheatwood was "pretty sick" and "in pretty bad shape" at the time of the theft. At some point prior to the sentencing hearing, Mr. Cheatwood passed away.

Denise Henson testified that she worked at a golf pro shop with the defendant's father. The defendant was hired at the pro shop after she completed her rehabilitation. Ms. Henson did not know the defendant personally until October 2013 but "knew her circumstances through her family, through her father." Ms. Henson was hospitalized in July and September 2013, and the defendant learned about the hospitalization when she was working at a golf tournament in October 2013 with Ms. Henson. The defendant began to ask Ms. Henson about the hospitalization and attempted to befriend her. The defendant would call Ms. Henson and seek out reasons to come over to her home, and these efforts made Ms. Henson suspicious as to the defendant's motives. Ms. Henson believed that the defendant was "trying too hard . . . to befriend" her and "had also heard that was kind of [the defendant's] routine."

Shortly after the tournament, the defendant made several phone calls to Ms. Henson asking for phone numbers of "friends and relatives." Ms. Henson refused to divulge the numbers, and that same day the defendant came to Ms. Henson's home asking "to get the phone number she had just called and asked for." This behavior did not "make sense" to Ms. Henson, and she refused to go to the door. Ms. Henson had a friend in the home with her, and she asked the friend to tell the defendant that Ms. Henson was lying down and that the defendant could not come into the home. Ms. Henson testified that the defendant did not come into her home, and that date was the only time she was aware that the defendant came to her home.

On October 26, 2013, Ms. Henson worked the morning shift at the country club. She returned to her house to prepare to host a football party. When she entered the house, she came in the rear entrance, as was her habit. She had placed a carpet in front of her front door, which she always kept locked. She also had recently placed duct tape around a pet door on the front door to prevent her cat from opening it. Ms. Henson noticed that the carpet was pushed back from the front door and that "the duct tape was

4

actually under where the door closed, and the door was pushed back." Ms. Henson was certain that she had not used the front door that day and "immediately had the feeling that someone had been in [her] house." She later discovered that some of her pain medication was missing. She reported the theft to police. After filing the police report, she spoke with the defendant's father, who encouraged her not to prosecute the case. Ms. Henson described the situation as "very uncomfortable."

Ms. Henson suffered from numerous ailments that required prescription pain medication. When some of her medication was taken, she had to wait five days before she was able to refill her prescription, and she went into withdrawal on the third day. She testified that the defendant did not appear remorseful for her actions.

Jason Dickey testified that he married the defendant in 2000 and that they had two children, ages eight and twelve, together. Mr. Dickey testified that in 2007, the defendant resigned from her job as a school counselor at a Lawrenceburg public school and entered a rehabilitation treatment program for an addiction to "painkillers." Mr. Dickey believed that the defendant completed her rehabilitation treatment. He was not aware of any injuries that the defendant sustained during the marriage that would have required treatment with pain medication, and he did not know that she had degenerative disk disease. He was aware that she saw various doctors to obtain pain medication. In the summer of 2007, Mr. Dickey discovered that the defendant was taking Lortab pills, and he saw that the defendant had taken the entire ninety-pill dosage over the course of five or six days. He contacted the prescribing physician, who informed him that he could not deny the defendant medication as long as she complained that she was in pain.

In 2010, the defendant and Mr. Dickey separated, and they later divorced in 2011. Mr. Dickey and the defendant divided their property, and, during the division, Mr. Dickey discovered a bottle containing twenty or thirty house keys. The keys did not fit the door of Mr. Dickey's home or the homes of any of the immediate family members of Mr. Dickey or the defendant. After the divorce, the two shared custody of the children, and Mr. Dickey would care for the children for one week and the defendant would care for them the next week. On the weekend of Halloween in 2013, the defendant was scheduled to have custody of the children. Mr. Dickey was forced to seek an emergency custody order on November 1 after he received a phone call saying that the defendant had broken into Mr. Cheatwood's home and that he needed to go get his children.

Mr. Dickey said that the consequences of the defendant's addiction to prescription drugs had been difficult for his children. The defendant's behavior forced the children to change schools, and the defendant told the children that since Mr. Dickey remarried, he would love his new wife more than he did his children. The defendant also told the

children that if Mr. Dickey had a child with his new wife, he would love the child more than he loved them and that Mr. Dickey would forget about them.

The defendant testified that she had several bachelor and advanced degrees. She testified that her addiction to painkillers began when she was suffering from neck pain and a member of Mr. Dickey's family gave her a Lortab. She was told to go visit a doctor who prescribed pain medication and who treated Mr. Dickey's grandmother. She went to see the doctor, and the defendant was diagnosed with degenerative disk disease in her C-4 and C-5 vertebra, along with a bulging disk. She was prescribed pain medication and received anti-inflammatory injections in her forehead and neck.

The defendant testified that when she broke into homes, she never took anything other than pain medications. After she received post-plea diversion for her first two burglaries, she attended and completed the year-long Teen Challenge program in Alabama. When she completed the program, the defendant returned to Lawrenceburg and participated in Safe & Smart, a program designed to educate youth about the dangers of drug usage. She testified that she was drug-free at the time and that she passed all of the drug tests that were administered as part of her probation.

The defendant admitted that she broke into Mr. Cheatwood's home and stole his medication. She testified that she was having difficulties with Mr. Dickey because he would threaten to take the children away from her if he disagreed with something that she said. As a result of this stress, she resumed using prescription drugs. She knew that Mr. Cheatwood had cancer, and she thought that he would have pain medication. She stated that she returned the pills to Mr. Cheatwood after seeing Mr. Frakes in the neighborhood and becoming afraid.

The defendant testified that she entered a best interest guilty plea in Ms. Henson's case because she did not take any medication from Ms. Henson. She testified that she only entered Ms. Henson's home one time and that she did so after Ms. Henson's friend let her into the house. She stated that she did not see Ms. Henson that day, and she testified that she did not enter the house at a later date or take anything from the residence. She agreed that she told an officer that she got to the threshold of Ms. Henson's house but left because she was afraid.

The defendant testified that spending time in jail had been difficult for her. She stated that she did not want to spend the rest of her life in jail and be absent from her children's lives. She testified that she was participating in Life Skills Reentry, which was a program that emphasized the importance of accepting responsibility for one's actions. She testified that she planned to continue to participate in the program and to live with her parents if she was released from jail. She believed that her parents would report it to

her probation officer if they witnessed her violate the terms of her probation. The defendant stated that she felt remorse for her actions and for the victims that she harmed. She admitted that she stole pain medication from Ms. Gilbert's husband. The defendant testified, "I have thought of me and what's [going to] make me feel better, forgetting that I have hurt [the victims]." The defendant admitted that her decisions had harmed her children in addition to her victims.

On cross-examination, the defendant testified that the "pain doctor" who prescribed her pain medication did not refer her to a neurologist or any other specialist for her pain issues. She testified that she never thought to seek a second opinion regarding her injuries. She stated that she lost her job at a Lawrenceburg school because she was taking medication from other teachers. She testified that she would enter the homes of other teachers and steal medication, either through an unlocked door, by using a bar to pry open the door, or by stealing their house keys and making copies. She agreed that she was never charged for theft in any of these instances, and she agreed that there were over fifteen different teacher statements in her personnel file indicating that medication was stolen. She agreed that it would be accurate to state that her personnel file reflected that the thefts were a reason that she left the school.

The defendant testified that after resigning from the school in Lawrenceburg, she attended a rehabilitation program for seven days. She was unable to stay longer because her insurance would not provide coverage. When she left, she was prescribed Suboxone, but she testified that this medication did not alleviate her pain. She testified that she broke into Mr. Scott's home and Ms. Woods's home to steal pain medication. She was not sure why she chose Mr. Scott's home, but she stated that she recalled having a conversation with Ms. Woods where Ms. Woods indicated that she suffered from neck pain. The defendant admitted that the church directory found by Investigator Hunter belonged to her and that she printed out maps to church members' homes. She stated that she was looking through the directory to see who might have prescriptions for pain medication. She targeted Mr. Cheatwood and Ms. Gilbert's husband because she knew they had cancer and she thought that they might have pain medication.

Cinde Lucas testified that she oversaw the Life Skills Reentry Program. Ms. Lucas testified that the defendant was a participant in the program and that she had completed ten of the sixteen steps. She believed that the defendant was willing to receive the assistance of the program to help her reenter society. Ms. Lucas indicated that the defendant was one of only a few enrollees in the program for whom Ms. Lucas was willing to testify.

Ken Moore, the defendant's father, testified that the defendant would be welcome in his home, provided that she remained sober. He stated that he would report the

7

defendant to her probation officer if he witnessed the defendant violate the terms of her probation.

Ann Brown testified that she worked with the Safe and Smart Center, which was an after-school and summer tutoring program. In the summer of 2012, Ms. Brown asked the defendant to volunteer at the center, and the defendant agreed. Ms. Brown testified that the children "loved" the defendant and that she worked well with the children. Ms. Brown explained how several of the participants of the program were juveniles with drug offenses and that the defendant would lecture the children about the consequences of drug usage and act as a mentor to them. Ms. Brown testified that the defendant had an "[o]verwhelming" desire to educate children about the dangers of drug usage. Ms. Brown agreed that in her fourteen years with the program, she never had a volunteer better than the defendant.

Both the State and the defendant submitted enhancement and mitigating factors for the trial court's consideration. Among the State's proposed enhancement factors was that the victims of the offense were particularly vulnerable due to age or physical or mental disability. T.C.A. § 40-35-114(4) (2010). The defendant offered as mitigating factors that her criminal conduct neither caused nor threatened serious bodily injury and that her prescription drug addiction was a substantial ground existing to excuse or justify her criminal conduct, though failing to establish a defense. T.C.A. §40-35-113(1), (3), (13).

The trial court ordered the defendant to serve her sentence in incarceration. The court found that the defendant had committed far more burglaries than she was charged with and that some were not even discovered. The court found that the defendant would "stop at nothing" to obtain prescription pain medication and noted that two prior attempts at rehabilitation had been unsuccessful. The court acknowledged the factors from Tennessee Code Annotated section 40-35-103 regarding a sentence of confinement. The court found that the defendant had "preyed upon . . . those who were the least able to protect themselves from her." The court stated that the defendant targeted individuals whom she knew to be sick or injured. The court found that the defendant brought her children with her when she burglarized Ms. Gilbert's home. The court found that the defendant's conduct exposed both herself and her victims to substantial risk. The court noted that the defendant was "calculating in her thievery" and that "her schemes indicate[d] a concerted effort to achieve her criminal goals." The court found that the defendant showed "little remorse for her actions." The court noted that her criminal activity occurred over a period of at least seven years and affected "numerous lives," including those of her children. The court observed that "[a]ll attempts to supervise and rehabilitate the defendant have proven unsuccessful." While noting the tragic effect of addiction, the court ordered her to serve her sentence in incarceration based upon the

8

defendant's "prolonged criminal history" and "lack of success of prior rehabilitative attempts."

The defendant filed a timely notice of appeal, and we proceed to consider her claims.

## ANALYSIS

The defendant argues that the trial court abused its discretion by denying her an alternative sentence. The defendant submits that the trial court failed to properly apply the factors in Tennessee Code Annotated section 40-35-103(1)(A)-(C) and did not properly consider her potential for rehabilitation. She contends that the trial court incorrectly found that she was responsible for the burglary of Ms. Gilbert's residence and that she brought her children with her. She argues that the trial court also erroneously found that the defendant displayed little remorse for her criminal conduct. She claims that the trial court only considered enhancement factors and did not consider any of the mitigating factors submitted by the defendant. The State responds that the trial court properly sentenced the defendant. We agree with the State.

This court reviews the denial of an alternative sentence that falls within the appropriate range and reflects that the decision was based on the purposes and principles of sentencing under an "abuse of discretion standard, accompanied by a presumption of reasonableness." *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012). This court should uphold a sentence "so long as the statutory principles, along with any applicable enhancement and mitigating factors, have been properly addressed." *State v. Bise*, 380 S.W.3d 682, 706 (Tenn. 2012).

As part of the defendant's guilty plea, the parties stipulated that the defendant was "entitled to [a] presumption to alternative sentencing." As a result of the 2005 amendments to the Sentencing Act, however, there is no longer a presumption that a defendant is a favorable candidate for an alternative sentence. *State v. Carter*, 254 S.W.3d 335, 347 (Tenn. 2008) (citing T.C.A. § 40-35-102(6)). Instead, "[a] defendant who does not fall within the parameters of subdivision (5) [of T.C.A. § 40-35-102], and who is an especially mitigated or standard offender convicted of a Class C, D, or E felony, should be considered as a favorable candidate for alternative sentencing options in the absence of evidence to the contrary." T.C.A. § 40-35-102(6)(A). Prior convictions of a defendant "shall be considered evidence to the contrary and, therefore, a defendant who is being sentenced for a third or subsequent felony conviction involving separate periods of incarceration or supervision shall not be considered a favorable candidate for alternative sentencing." *Id.* The code provision defines "separate periods of incarceration or supervision" to mean "that the defendant serves and is released or

9

discharged from a period of incarceration or supervision for the commission of a felony prior to committing another felony." T.C.A. § 40-35-102(6)(B).

Here, the defendant was a favorable candidate for alternative sentencing. All four of the defendant's conviction offenses were Class C felonies. Although the defendant previously pled guilty to two of the offenses, she received post-plea diversion for these offenses, and the sentences were ordered to be served concurrently. Accordingly, they did not result in "separate periods of incarceration" and do not preclude the defendant from being considered as a favorable candidate for an alternative sentence. *See State v. William Alexander Beasley, IV*, No. M2009-02605-CCA-R3-CD, 2010 WL 4812855, at *7 (Tenn. Crim. App. Nov. 24, 2010).

When imposing a sentence, the trial court should consider: (1) the evidence, if any, received at trial and at the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the applicable enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant wishes to make in his own behalf about sentencing. T.C.A. § 40-35-210(a), (b)(1)-(7). In determining whether incarceration is an appropriate sentence, the trial court should consider whether:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

T.C.A. § 40-35-103(1)(A)-(C). Additionally, the trial court must consider the defendant's potential or lack thereof for rehabilitation or treatment in determining whether an alternative sentence is warranted. T.C.A. § 40-35-103(5).

The trial court found that the defendant's prolonged criminal history and lack of success with prior rehabilitative efforts necessitated a sentence of confinement. The record is replete with evidence of the defendant's lengthy if not continuous criminal history. The record reflects that the defendant began stealing prescription medication in 2007, as she admitted that she was forced to resign from her job as a school teacher

10

because she was taking medication from numerous other teachers. She also admitted that she stole medication from Ms. Gilbert's husband, and the trial court clearly credited Ms. Gilbert's testimony that the defendant's young son was with her at the time of the theft. She stole medication from Mr. Scott and Ms. Woods, and she admitted that she took medication from several members of her church. The trial court found that attempts to rehabilitate the defendant had proved unsuccessful, and the record reflects that she attended two separate rehabilitation treatment programs but continued to use and steal prescription medication. Additionally, the defendant received post-plea diversion and probation, which she violated by committing the offenses against Mr. Cheatwood and Ms. Henson. Although the defendant testified that she was remorseful for her actions, the trial court, who is in the best position to observe the demeanor of the witnesses, found that she showed little remorse. At a sentencing hearing, "this Court gives great weight to the determinations made by the trial court concerning the credibility of the witnesses; and this Court will not interfere with the trial court's findings of fact in this regard unless the evidence contained in the record clearly preponderates against these findings." *State v. Melvin*, 913 S.W.2d 195, 202 (Tenn. Crim. App. 1995). As to the defendant's argument that the trial court did not address her proposed mitigating factors, the court found that her conduct posed substantial risk to herself and to her victims and noted the severe impact of addiction on society. In any event, enhancement and mitigating factors are merely advisory, and the misapplication of an enhancement or mitigating factor "does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Bise*, 380 S.W.3d at 706. We conclude that the trial court properly considered the purposes and principles of the Sentencing Act, and the record supports the findings of the trial court. The defendant is not entitled to any relief.

## CONCLUSION

Based upon the foregoing, we affirm the judgment of the trial court.

_____
JOHN EVERETT WILLIAMS, JUDGE

11